[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 26, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-12051

_____

D.C. Docket No. 05-00005-CR-001-HL-7

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

    versus

NICKY TAMPAS,

                                        Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

**(July 26, 2007)**

Before EDMONDSON, Chief Judge, TJOFLAT and GIBSON,* Circuit Judges.

GIBSON, Circuit Judge:

_____

    * Honorable John R. Gibson, United States Circuit Judge for the Eighth Circuit, sitting by designation.

Nicky J. Tampas appeals his convictions for conspiracy to commit embezzlement, 18 U.S.C. § 371 in connection with 18 U.S.C. § 666, embezzlement, 18 U.S.C. § 666, and misleading conduct, 18 U.S.C. § 1512(b)(3). Tampas also appeals his sentence of concurrent terms of 60 and 97 months' imprisonment and an order to pay $1,405,821.77 in restitution. We vacate the portion of the sentence ordering an incorrect amount of restitution and remand for resentencing but otherwise affirm Tampas's convictions and sentence.

Tampas was president and executive director of the YMCA of Valdosta-Lowndes County, Georgia, where he had a 26-year career. As president, he ran the day to day operations of the YMCA, managed its finances, and reported to the board of directors. Tampas worked closely with finance director Toni Fillyaw, who was responsible for the YMCA's payroll and accounts payable. In addition, Tampas was the YMCA's listed representative on several of its American Express cards.

Tampas hired W. Lee Patrick and his landscaping company to perform maintenance, repair, and some construction projects at the YMCA, and to perform landscaping work and home improvement projects at Tampas's own house. Tampas arranged for Patrick's employees to be paid directly by the YMCA as contractors, an arrangement the YMCA board never authorized. Tampas and Fillyaw issued YMCA checks to Patrick and his employees based on handwritten

2

slips of paper Patrick submitted listing his employees' names and dollar amounts to be paid, rather than the descriptive invoices the YMCA typically used. Unlike other bills, Patrick's were handled solely by Fillyaw and not by the other bookkeeper responsible for entering expenses into the YMCA's computer system. Fillyaw also handled bills for the YMCA American Express account Tampas used.

In December 2002, it was discovered that Fillyaw had failed to remit payroll taxes that had been withheld from YMCA employees' checks to the federal and state taxing authorities; instead, the funds were kept in the YMCA's general operating account. This resulted in an unpaid principal tax liability of $1.4 million, plus penalties. Fillyaw was terminated and eventually was convicted of theft of government property and mail fraud. After the unpaid taxes were discovered, the FBI began an investigation into the YMCA's books. As YMCA officials also began to examine and organize the books, they noticed other financial irregularities. Don Pope, treasurer of the board of directors, took over signing YMCA checks in Fillyaw's stead and became suspicious of large payments the YMCA had issued to Patrick without documentation of what work he had done, and large charges on the YMCA American Express card used by Tampas, where Pope was able to find only three months' worth of statements for the account. The YMCA's outside auditor also was troubled by the size of YMCA payments to Patrick and his discovery that Tampas had endorsed one of his

YMCA paychecks over to Patrick. Tampas became angry when questioned about the payments. In the spring of 2003, Tampas asked one of his subordinates, Paul Arambula, to prepare a spreadsheet attributing two years' worth of Patrick's job receipts to various YMCA projects. Seeing that the value of the receipts far exceeded the value of the work Patrick and his employees had done at the YMCA, Arambula reported the matter to the YMCA board and its attorney and resigned from his position. The board voted to request that Tampas resign, and he acceded to that request.

In February 2005, a grand jury indicted Tampas and Patrick on one count of conspiracy to commit embezzlement from an organization receiving federal funds in violation of 18 U.S.C. § 371 in connection with § 666, and one count of embezzlement from an organization receiving federal funds, in violation of 18 U.S.C. § 666. The indictment also charged Tampas with an additional count of embezzlement based on his allegedly making personal charges on the YMCA's American Express cards, in violation of 18 U.S.C. § 666, and a count of making false statements to the FBI, in violation of 18 U.S.C. § 1001(a)(2). A superseding indictment was filed in July 2005, restating the counts alleged in the first indictment and adding a count against each defendant for misleading conduct in violation of 18 U.S.C. § 1512(b)(3). The case proceeded to separate trials for Patrick and Tampas; Patrick was tried first and convicted.

4

At Tampas's trial, on the conspiracy and first embezzlement counts, the government alleged that Tampas had a kickback arrangement with Patrick in which Tampas had the YMCA pay more than its share of Patrick's costs in exchange for Patrick performing work at Tampas's home at little or no charge to Tampas. Patrick's employees testified that they often received paychecks directly from the YMCA when their time had been spent working for Patrick's other clients, including Tampas. When employees questioned him about the source of their paychecks, Patrick told them that he had an account with the YMCA and deposited funds there, but there was no record of such an arrangement. Patrick's employees also testified that they did weekly yard work at Tampas's house using YMCA equipment and that they performed costly home improvement projects for Tampas, including building a $47,000 gazebo and a $65,000 addition and remodel. An FBI agent testified that Tampas told him he had paid Patrick in cash and had receipts for all this work, but, although Tampas produced the paycheck he had endorsed over to Patrick and elicited testimony from other contractors that he had paid those contractors in cash, he was not able to produce receipts for most of the work Patrick's company had done at his home. The evidence showed that the YMCA issued payments to Patrick and his employees totaling approximately $890,000 between April 2000 and December 2002. Tampas's witnesses testified that Patrick's landscaping company had performed landscaping, cleanup, and

general repair work on a regular basis at the YMCA, as well as more substantial projects like building a cement block shed to house pool equipment and chemicals and remodeling the lobby. The government's expert estimated the value of the building projects at approximately $115,000. Tampas's expert estimated the value of all the work performed at the YMCA at $1,097,000 if performed by a commercial contractor (which Patrick was not).

On the second embezzlement count, the government produced evidence that Tampas improperly used the YMCA's American Express accounts to make personal purchases. FBI analyst Charlotte Lockhart reviewed the account charges and testified that, after giving Tampas credit for YMCA-authorized charges, she estimated that his personal charges exceeded $57,000, including a home newspaper subscription and weekend purchases at grocery stores, bookstores, clothing and shoe stores, and restaurants. Tampas elicited testimony from YMCA board members and employees that buying food and supplies for YMCA functions was part of his job. Furthermore, Tampas claimed that he reimbursed the YMCA for his personal charges and told the FBI that the YMCA owed him $17,000 for cash loans he had made to the organization. He had no records, however, to support these claims.

The government's evidence on the misleading conduct count consisted primarily of the testimony of former YMCA employee Paul Arambula. Arambula

6

testified that Tampas asked him to create a spreadsheet reconciling two years' worth of Patrick's "hand receipts" with various YMCA projects. Tampas's request came at a time when suspicion was mounting about the YMCA's sizable payments to Patrick and his employees. Arambula testified that he refused to make the spreadsheet because he was disturbed by the large disparity between the value of the work done and Patrick's receipts, which did not contain detailed information to explain the charges.

The jury convicted Tampas of the conspiracy count, both counts of embezzlement, and the misleading conduct count, but it found him not guilty of making a false statement to the FBI. The court sentenced Tampas to 60 months' imprisonment on the conspiracy count and 97 months on each of the three remaining counts, with all terms to run concurrently. It also ordered him to pay restitution to the YMCA in the amount of $1,405,821.77. This appeal followed.

Tampas asserts several arguments on appeal. First, he argues that the evidence was insufficient to support his conviction on each count. Second, he argues that his convictions for conspiracy and the two embezzlement counts must be reversed because the district court's jury instructions constructively amended the indictment. Next, Tampas contends that the district court prejudiced his right to a fair trial by admitting evidence about the YMCA's unpaid taxes. He also contends that his conviction should be reversed because both the prosecutor and

7

the district court made improper comments in violation of his constitutional rights. Finally, he challenges his sentence, arguing that it is unreasonable because the obstruction of justice enhancement and loss determination are incorrect, and that the restitution order was improper. We address each allegation of error in turn.

## I. Sufficiency of the evidence

Tampas challenges the sufficiency of the evidence on all four counts of conviction. At the close of the government's evidence, Tampas moved for acquittal, which the district court denied. We review de novo the denial of a motion for acquittal and the sufficiency of the evidence to sustain a conviction, viewing the evidence in the light most favorable to the government and drawing "all reasonable inferences and credibility choices in favor of the jury's verdict." United States v. Evans, 344 F.3d 1131, 1134 (11th Cir. 2003). The jury is free to choose among alternative reasonable interpretations of the evidence, United States v. Arbane, 446 F.3d 1223, 1226 n.1 (11th Cir. 2006), and the government's proof need not exclude "every reasonable hypothesis of innocence," United States v. Young, 906 F.2d 615, 618 (11th Cir. 1990). We affirm if a reasonable juror could have concluded that the evidence established Tampas's guilt beyond a reasonable doubt. See United States v. Hasson, 333 F.3d 1264, 1270 (11th Cir. 2003).

A. Conspiracy count

To prove that Tampas engaged in a conspiracy to embezzle funds from the YMCA, the government had to prove: 1) the existence of an agreement to achieve an unlawful objective, 2) Tampas's knowing and voluntary participation in the agreement, and 3) the commission of an act in furtherance of the agreement. 18 U.S.C. § 371; United States v. Cure, 804 F.2d 625, 628 (11th Cir. 1986). Tampas argues that no reasonable juror could have convicted him of conspiracy because the government failed to prove a meeting of the minds between him and Patrick. We conclude, however, that the government produced substantial circumstantial evidence from which the jury could infer that Tampas and Patrick agreed to embezzle funds from the YMCA. Tampas arranged for the YMCA to pay Patrick's employees directly without seeking board approval, and he issued such payments with no more documentation of work from Patrick than a handwritten sheet of paper listing workers' names and amounts due. At the same time, Patrick's company performed major home improvement work at Tampas's house with scant record of payment from Tampas. Tampas points out that Patrick's employees testified that they never dealt with Tampas, but this is largely beside the point where the kickback scheme was between Patrick and Tampas, not Tampas and Patrick's employees. Tampas also emphasizes Patrick's employees' testimony that Patrick insisted they keep accurate client records, but the jury was

9

free to draw the inference that any such admonition was not followed with respect to the handwritten time slips Patrick submitted to Tampas and the YMCA. Substantial circumstantial evidence supports Tampas's conspiracy conviction. See United States v. Gupta, 463 F.3d 1182, 1194 (11th Cir. 2006) (conspiracy can be proven by circumstantial evidence), cert. denied, 127 S. Ct. 2446 (2007).

B. First embezzlement count

Next, Tampas challenges the sufficiency of the evidence on the embezzlement conviction based on his kickback arrangement with Patrick. To convict Tampas of embezzlement, the government had to prove: 1) Tampas converted property from the YMCA, 2) that property was valued at $5,000 or more, and 3) the YMCA received in excess of $10,000 each year in federal funds. 18 U.S.C. § 666. In challenging the first embezzlement conviction, Tampas points out that Patrick's employees frequently worked on the YMCA grounds, implying that Patrick's bills were legitimate, not padded, and thus no reasonable juror could conclude that Tampas converted YMCA funds by paying those bills. The jury was not required to accept Tampas's theory, however, where the government's substantial evidence of guilt showed that the payments issued to Patrick and his workers far exceeded the value of the work they did at the YMCA, Tampas arranged for Patrick's employees to receive payment directly from the YMCA without board approval, and Tampas and Fillyaw always handled Patrick's

10

timesheets, which deviated from the standard procedure for processing bills at the YMCA. Meanwhile, Patrick and his employees performed extensive home improvement services at Tampas's home, and Tampas had no record of payment for most of those services. This is sufficient to allow a reasonable juror to conclude that Tampas embezzled YMCA funds by paying padded bills Patrick submitted to the YMCA.

C. Second embezzlement count

In challenging the embezzlement conviction that was based on his personal charges on the YMCA's American Express card, Tampas argues that the government failed to prove that the charges were improper, the government failed to prove that he was the individual who made the allegedly improper charges, and the summary charts put together by FBI Analyst Lockhart cannot support his conviction because they never should have been admitted under Fed. R. Evid. 1006. We reject Tampas's argument that the government produced insufficient evidence that he converted the requisite amount of funds. Tampas argues that his charges were proper under the bona fide salary exception of 18 U.S.C. § 666(c), where YMCA board members and employees testified that Tampas was expected to use the card for travel expenses and to purchase things like food for large-scale YMCA events and ordinary business meetings. However, the testimony of these employees and board members does not show that the charge account was part of

11

Tampas's salary under 18 U.S.C. § 666(c); salary is a budgetary matter for official vote of the board, and Tampas produced no evidence that the board voted to give him a YMCA American Express account to use for personal expenses as part of his compensation package.

Tampas also argues that no reasonable juror could find his charges improper where the charges had been classified under various categories of the YMCA budget, and the YMCA's auditor testified that the expenditures were within budgetary limits. That the expenditures were within the budget means little, because even over-budget expenditures would not have constituted embezzlement as long as they were for YMCA business rather than Tampas's personal use. By the same token, unauthorized personal expenditures do not become proper just because they are susceptible of classification within budgetary limits. A reasonable juror could have concluded that Tampas's position of control over the YMCA's finances allowed him to disguise personal charges as business expenditures within the YMCA budget so that his use of the credit card would not raise any alarms.

Next, Tampas argues that the government failed to prove he was the person who made the allegedly improper charges, citing a YMCA board member's testimony that multiple people used each YMCA card, Lockhart's testimony that some of the charging activity on the card was consistent with use by more than one

12

person, and evidence that no one reviewed the charge slips to verify that Tampas signed them. We conclude that the government produced sufficient evidence to allow a reasonable juror to conclude that Tampas was responsible for the improper charges, where witnesses testified that Tampas used the card, the statements were addressed to him, and in an FBI interview he admitted that he used the card to make $5,000 to $6,000 in personal purchases. The evidence is sufficient to support Tampas's second embezzlement conviction without regard to Lockhart's summary charts of the improper charges, and we reject Tampas's contention that he was improperly convicted in a "trial by charts," see United States v. Richardson, 233 F.3d 1285, 1293 (11th Cir. 2000).

D. Misleading conduct count

Tampas also challenges the sufficiency of the evidence on his conviction for misleading conduct. To prove that Tampas engaged in misleading conduct, the government had to show: 1) Tampas knowingly and willfully engaged in misleading conduct toward another person, 2) with the intent to hinder, delay, or prevent the communication of information to a federal law enforcement officer, 3) about the commission or the possible commission of a federal crime. 18 U.S.C. § 1512(b); United States v. Veal, 153 F.3d 1233, 1253 (11th Cir. 1998), cert. denied, 526 U.S. 1147 (1999). This charge was based on Tampas's actions in asking Arambula to make a spreadsheet attributing two years' worth of Patrick's hand

13

receipts to jobs Patrick's company performed at the YMCA. See Veal, 153 F.3d at 1247 (misleading conduct statute encompasses "a wide range of conduct that thwarts justice," including "us[ing] unwitting third parties" to conceal the truth). Tampas contends that the evidence shows only that he asked for a spreadsheet organizing legitimate financial documents, and no reasonable juror could conclude his conduct was misleading because Fillyaw had left the YMCA's books in disarray and everyone, including Tampas, was sorting through various receipts in an organization-wide effort to straighten out the financial records. The government produced sufficient evidence, however, from which a reasonable juror could conclude that Tampas's superficially benign request was really an effort to mislead Arambula into creating a record that would hide the scheme Tampas had undertaken with Patrick. A reasonable juror could conclude that the receipts Tampas tendered to Arambula were not legitimate business records, but fraudulent, padded bills, in light of the government's evidence that Patrick's employees frequently received paychecks issued by the YMCA for time they spent at other clients' sites. It is also reasonable to infer that Tampas's goal was to create a record justifying the YMCA's inflated payments to Patrick, which the YMCA treasurer and auditor both had begun to question. In light of this evidence and Arambula's testimony on the "great disparity" between the vague receipts and

14

the value of the jobs Tampas asked him to reconcile, the jury was free to reject Tampas's innocent explanation for his conduct.

Tampas also challenges the government's proof on the misleading conduct count as varying from the allegations set forth in the indictment, which alleged that he asked Arambula to create "backdated" records. It is true that Arambula did not testify that Tampas asked him specifically to "backdate" the records, but this does not give rise to reversible error. The government proved the statutory elements of misleading conduct, the offense alleged in the indictment, and Arambula's testimony does not so materially diverge from the allegations in the indictment that Tampas has suffered substantial prejudice. See United States v. Weissman, 899 F.2d 1111, 1114 (11th Cir. 1990) (variance between indictment and evidence is reversible error only if facts proved diverge materially from those alleged and the defendant suffers substantial prejudice).

Thus, we conclude that the evidence is sufficient to support Tampas's convictions on all counts.

## II. Constructive amendment of the indictment

Tampas argues that his convictions on the conspiracy and the two embezzlement counts must be reversed because the district court's jury instructions constructively amended the indictment. If he is correct, this is reversible error per se because it violates his Fifth Amendment right to be tried on

15

the charges presented by the grand jury. United States v. Weissman, 899 F.2d 1111, 1114 (11th Cir. 1990). Tampas points out that the indictment alleged that the object of his and Patrick's conspiracy was to embezzle $864,000 in YMCA funds and that he embezzled approximately $50,000 in YMCA funds by using the YMCA American Express card to make personal purchases. The district court instructed the jury that the government had to prove that Tampas converted at least $5,000 on each count, as required by the embezzlement statute, 18 U.S.C. § 666; the instructions did not require the jury to find that the government had proved the much higher dollar amounts alleged in the indictment.

The differences Tampas identifies between the jury instructions and the indictment do not show that the indictment was constructively amended. A constructive amendment occurs when the essential elements of the offense as alleged in the indictment are altered to broaden the potential bases for conviction beyond what the indictment contains. United States v. Narog, 372 F.3d 1243, 1247 (11th Cir. 2004); United States v. Keller, 916 F.2d 628, 634 (11th Cir. 1990). In this case, the indictment and the jury instructions are wholly compatible. Count I of the superseding indictment alleged that Tampas and Patrick conspired to embezzle "property having a value in excess of $5,000," Count II alleged that the two defendants embezzled "property having a value in excess of $5,000," and Count III alleged that Tampas embezzled "property having a value in excess of

16

$5,000." This is precisely what the court's instructions required the jury to find. While the factual allegations of the indictment elaborate on the statutory charges by alleging that the object of the conspiracy was to embezzle $864,000 and that Tampas embezzled approximately $50,000 through his use of the American Express card, the court was not required to instruct the jury that it had to find these amounts to convict. By alleging that Tampas conspired to embezzle and did embezzle $864,000 with Patrick and embezzled approximately $50,000 on his own, the grand jury necessarily alleged that Tampas's crimes involved at least $5,000 on each count, which is what the district court required the trial jury to find. Thus, there was no constructive amendment of the indictment.

### III. Admission of tax evidence

Tampas argues that the district court prejudiced his right to a fair trial by admitting evidence about the YMCA's unpaid payroll taxes over his objection. He points out that the indictment did not charge him with any tax-related crimes, and he characterizes the tax-related evidence as other crimes evidence under Fed. R. Evid. 404(b), admissible only if the government has sufficient proof that the defendant committed the act and can show that the probative value of the evidence is not substantially outweighed by its undue prejudice. See United States v. Miller, 959 F.2d 1535, 1538 (11th Cir. 1992) (en banc).

17

We review the admission of evidence for abuse of discretion. See United States v. Range, 94 F.3d 614, 620 (11th Cir. 1996). We cannot conclude that the district court abused its discretion in this case by admitting evidence of the YMCA's unpaid payroll taxes. First, the government did not offer the evidence to suggest that Tampas was responsible for tax-related offenses; rather, the evidence was offered to explain how surplus cash was available to fund Tampas's and Patrick's kickback scheme, which went undetected by auditors and by the YMCA board for years while the inflated operating account balance fostered the impression that the YMCA's finances were strong. Moreover, the evidence reasonably supports an inference that Tampas knew about Fillyaw's failure to remit the taxes and had access to the excess funds; Tampas and Fillyaw met several times a day, Tampas managed and was very knowledgeable about the YMCA's finances, and he showed little shock when the auditor informed him of the unpaid taxes. The prejudice Tampas claims to have suffered does not outweigh the probative value of this evidence, and the district court did not err in admitting it.

## IV. Improper comments

Tampas also seeks reversal on the basis of two instances of improper comments during his trial, one by the prosecutor and one by the district court. The first instance arose when the government questioned one of Patrick's former

18

employees about Patrick's explanation for why her paychecks were issued by the YMCA when she had worked for other clients. Tampas objected to the testimony as hearsay, and the government responded that the statement should be admitted under the co-conspirator exception to the hearsay rule, Fed. R. Evid. 801(d)(2)(E). In the jury's presence, the prosecutor further argued that "the Court makes the preliminary ruling at some point during the trial whether a conspiracy has been established, and . . . . I submit that we have established the elements of [the conspiracy count] sufficient for this witness to talk about this statement." The jury then was dismissed for lunch, and Tampas argued that the court should not allow the statement because, in light of the prosecutor's remarks, the jury would assume that the court had found him guilty of the conspiracy count. The court overruled Tampas's objection and gave the jury a curative instruction.

We review determinations of prosecutorial misconduct de novo, United States v. Noriega, 117 F.3d 1206, 1218 (11th Cir. 1997), reversing only if the defendant's substantial rights were prejudiced, United States v. Hasner, 340 F.3d 1261, 1275 (11th Cir. 2003). Even if a prosecutor's remark is prejudicial, it may be harmless if a curative instruction is given. United States v. Bailey, 123 F.3d 1381, 1400 (11th Cir. 1997). In this case, the prosecutor's remark does not entitle Tampas to a new trial. The statement was addressed to the court, not the jury, and was made in the context of an evidentiary objection to describe the court's role in

19

determining whether to admit hearsay evidence.  See United States v. Onori, 535 F.2d 938, 943-44 (5th Cir. 1976) (finding no reversible error where statement arguably suggesting court's belief in defendant's guilt was not addressed to jury, was in context of procedural discussion, and curative instruction was given). Furthermore, any prejudice was rendered harmless by the curative instruction, which expressly stated that, by allowing the witness to answer, the court did not "express, intimate, or in any way suggest anything about the guilt or innocence of the defendant," which was "a matter solely for [the jury's] determination."

Tampas also argues that his constitutional rights were violated when, after a government objection to a defense witness's testimony, the district court asked, "Why can't the defendant testify about that?  Isn't that hearsay?"  Although both defense counsel and Tampas himself had informed the court earlier that Tampas planned to testify, counsel said that Tampas's plans had changed and moved for a mistrial, characterizing the court's question as a comment on Tampas's failure to testify in violation of his Fifth Amendment rights.  The court denied the motion and offered to give a curative instruction, which Tampas declined.  On appeal, Tampas reiterates his argument that the district court's question amounts to an impermissible comment on his failure to testify.  See Griffin v. California, 380 U.S. 609, 615 (1965) (Fifth Amendment forbids comment on defendant's silence).

We review the denial of a motion for a mistrial for abuse of discretion. See United States v. Ettinger, 344 F.3d 1149, 1161 (11th Cir. 2003). Reversal is warranted only if the court made prejudicial comments that had a clear effect on the jury and amounted to the denial of a fair trial. United States v. Morales, 868 F.2d 1562, 1576 (11th Cir. 1989). The district court's question to defense counsel did not have that effect in this case. Viewing the allegedly improper comment in its trial context, see United States v. Knowles, 66 F.3d 1146, 1163 (11th Cir. 1995), the brief question to defense counsel in the context of an evidentiary objection had no clear effect on the jury. See United States v. Haynes, 573 F.2d 236, 239 (5th Cir. 1978) ("single simple statement in the context of an evidentiary ruling," followed by cautionary instructions, was not prejudicial).

## V. Reasonableness of sentence

The district court sentenced Tampas to 60 months' imprisonment on the conspiracy conviction and 97 months' imprisonment on each of the other three counts, with all terms to run concurrently. According to the district court's calculations and those of the Presentence Investigation Report, Tampas's range was 97-121 months under the Sentencing Guidelines. Tampas argues that his sentence is unreasonable because the district court incorrectly applied the Guidelines by imposing a two-level upward adjustment for obstruction of justice

21

and by incorrectly calculating the amount of loss for purposes of the amount of loss enhancement.

We review a district court's factual findings regarding the imposition of a sentencing enhancement for obstruction of justice for clear error and its application of the factual findings to the Guidelines de novo. United States v. Massey, 443 F.3d 814, 818 (11th Cir. 2006). Guideline § 3C1.1 provides for a two-level sentence enhancement where

> (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense.

U.S.S.G. § 3C1.1 (2005).

The Presentence Investigation Report recommended an obstruction of justice enhancement based on Tampas asking Arambula to create a spreadsheet reconciling Patrick's receipts with jobs he had performed at the YMCA; the Report characterized this activity as attempting to create a set of backdated records. The district court adopted this recommendation and imposed the enhancement. Tampas argues that the facts are insufficient to support this enhancement, pointing out that the government never established that he asked Arambula to backdate records, only that he asked for a spreadsheet organizing

22

financial documents that he claims were legitimate. The government argues that the same evidence that supports Tampas's conviction on the misleading conduct count supports this enhancement.

We conclude that the district court did not err in applying the obstruction of justice enhancement. While it is true that Tampas did not ask Arambula to alter or destroy any documents, and did not use the word "backdate," the evidence supports an inference that his goal was to conceal his embezzlement scheme by creating YMCA records to make fraudulent expenditures appear legitimate. Patrick's employees' testimony strongly suggested that the receipts Patrick had submitted to Tampas were padded bills, and thus fraudulent documents, not legitimate business records. Arambula testified that Tampas asked him to "reconcile" these vague receipts with Patrick's jobs at the YMCA, where those receipts went back two years and were not at all commensurate with the value of Patrick's work at the YMCA. Backdating may not be the most apt description for this request, but it can be characterized fairly as "attempting to produce a false . . . record," § 3C1.1, cmt. n.4(c) (2005). The timing of the request supports this interpretation of the evidence, as the YMCA treasurer and outside auditor recently had raised questions about the YMCA payments to Patrick, and an FBI investigation into the YMCA's books was underway. In light of these

23

circumstantial facts, the district court correctly imposed the obstruction of justice enhancement.

We now turn to Tampas's argument that the district court incorrectly computed the amount of loss for purposes of the 16-level enhancement it imposed pursuant to U.S.S.G. § 2B1.1(b)(1)(I) (2005) (actual or intended loss between $1 million and $2.5 million). In applying the amount of loss enhancement, the district court relied on the Presentence Investigation Report, which determined that Tampas intended loss equal to the YMCA's $1.4 million unpaid principal tax liability, explaining that the object of the conspiracy was to embezzle those funds. Tampas objected to this determination at his sentencing hearing, noting that the indictment had not alleged that either he or Patrick was involved in or knew about the YMCA's unpaid taxes, and there was no evidence implicating them in that matter. Acknowledging the complexities in the amount of loss calculation, the district court stated that it "would have imposed this sentence regardless of the recommendations of the Sentencing Guidelines as they relate to a specific amount of loss." Because the amount of loss enhancement did not affect Tampas's sentence, we do not pass on the question of whether the district court's calculation of the amount of intended loss, which the government admits was imprecise, was error. The court recognized that the Guidelines are advisory and stated that the sentence complied with the factors set forth in 18 U.S.C. § 3553(a), and Tampas's

24

97 month sentence is within the ten-year maximum sentence permitted by the statute, 18 U.S.C. § 666(a). Under these circumstances, where the district court would have imposed the same sentence regardless of the Guidelines' recommendations on the amount of loss, any error in its loss calculation is harmless. See United States v. Williams, 456 F.3d 1353, 1360 (11th Cir. 2006), petition for cert. dismissed, — S. Ct. —, 2007 WL 1839575 (U.S. June 28, 2007); United States v. Paley, 442 F.3d 1273, 1278 (11th Cir. 2006).

## VI. Restitution order

Finally, we review the district court's factual finding as to the specific amount of restitution for clear error. United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000). At sentencing, the district court ordered Tampas to pay the YMCA restitution of $1,405,821.77, the amount of unpaid payroll taxes. Tampas argues, and the government concedes, that the district court clearly erred in imposing this restitution order. The government never sought to prove that Tampas's embezzlement scheme caused the YMCA's failure to pay its payroll taxes; it only suggested that the tax withholdings may have provided surplus cash to fund the scheme. See 18 U.S.C. § 3663A(a) (authorizing restitution for losses directly and proximately resulting from offense of conviction). Thus, we vacate the restitution order.

The parties disagree on whether we should remand the case for resentencing. At sentencing, the YMCA's victim-loss statement focused on the unpaid taxes, so, in formulating the restitution order, the court did not consider other losses the YMCA suffered. The government seeks a remand so that it can prove that the YMCA is due restitution for those losses, including the payments improperly issued to Patrick and his employees. Tampas asks us to vacate the restitution order without remanding for resentencing, arguing that a remand unfairly would give the government two bites at the apple, but he cites no authority for this proposition. Thus, we remand for resentencing on the restitution issue. The parties also disagree about whether Tampas should receive credit against any restitution order for the value Patrick and his employees conferred on the YMCA, but we leave this issue to the district court at resentencing.

In sum, we **AFFIRM** Tampas's convictions and sentence of imprisonment. We **VACATE** the restitution order and **REMAND** for resentencing on restitution.