[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-16885
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 11, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 08-00149-CR-T-26-MAP

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALBERTO AGUIRRE-OROZCO,
a.k.a. Alberto Aquirre,
a.k.a. Betos,
a.k.a Donkey Head,
OTIS CARDEN, a.k.a. Cowboy,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(August 11, 2009)

Before TJOFLAT, EDMONDSON and FAY, Circuit Judges.

PER CURIAM:

In this consolidated appeal, codefendants Otis Carden and Alberto Aguirre-Orozco appeal their convictions for methamphetamine-related offenses. On appeal, Carden argues that the district court erred in denying his motion for judgment of acquittal as to the charge of conspiracy to distribute and to possess with intent to distribute methamphetamine, submitting that the government presented no evidence that would support the finding that he conspired with Aguirre-Orozco, and that the evidence established only a buyer and seller relationship between them, which was insufficient to show that they were in a conspiracy.

Aguirre-Orozco argues, first, that the district court erred in instructing the jury that it could consider his flight as evidence of his guilt because his flight occurred almost one month after law enforcement received information in connection with Aguirre-Orozco's involvement in the conspiracy, and his status as an illegal alien present in the United States explained his flight and negated any inference that his flight showed his consciousness of guilt with respect to the instant drug-trafficking charge. Second, Aguirre-Orozco argues that the district court plainly erred in allowing Carden's statements to be read into evidence, pursuant to the Supreme Court's decision in Bruton v. United States, 391 U.S. 123,

2

88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), because Carden did not testify at trial, which violated his rights under the Confrontation Clause of the U.S. Constitution. Finally, Aguirre-Orozco argues that the district court abused its discretion under Rule 404(b) of the Federal Rules of Evidence by admitting three of his prior convictions into evidence at trial, submitting that they were only relevant to show his propensity to commit drug-related offenses in general. For the reasons set forth below, we affirm.

## I.

A federal grand jury charged Aguirre-Orozco and Carden in a 5-count superseding indictment, specifically charging both with conspiracy to distribute and possess with intent to distribute 500 grams or more of a substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A) ("Count 1"), and also charging Carden with possession with intent to distribute a substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) ("Count 4"), and Aguirre-Orozco with possession with intent to distribute 5 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B) ("Count 5").

Before trial, Carden filed a motion in limine to exclude certain evidence at trial, specifically seeking to exclude summaries of recorded telephone

3

conversations and written correspondence made while Carden was incarcerated, and he argued that this evidence should be excluded because it was irrelevant and prejudicial. Aguirre-Orozco moved to adopt Carden's motion in limine, noting that it presented the same legal arguments that Aguirre-Orozco sought to make in his attempt to prevent the government from introducing evidence of his three prior convictions under Rule 404(b). The district court granted Aguirre-Orozco's motion to adopt Carden's motion in limine.

At the trial of both Aguirre-Orozco and Carden, the court heard the parties' arguments with respect to the motion in limine, and the court denied the motion on the merits. The government then called Manuel Armando Canales, who was then in prison for conspiracy to traffic methamphetamine and possession of a firearm, and he testified as follows. He was expecting a sentence reduction for his cooperation. Canales used to buy methamphetamine from Aguirre-Orozco, had been directly dealing with him for six to eight months before he was arrested, and was dealing in quantities ranging from one-fourth of a pound to one pound. Carden was Canales's "partner," they would pool their money to buy larger amounts of drugs, distribute them, and share the profit, and they would share their drug supply with each other. He received a pound of methamphetamine from Aguirre-Orozco "maybe 10 times." On 2 occasions, Canales had helped

Aguirre-Orozco unload 10 to 15 pounds of methamphetamine from under the hood of a car. Out of those shipments, he and two other individuals received methamphetamine, and Aguirre-Orozco cut the rest of the methamphetamine with a horse supplement. He had seen Carden cutting methamphetamine. Canales smoked methamphetamine with Aguirre-Orozco, who shared his "personal stash" with him and others. It took only "[o]ne good" hit of the methamphetamine to get high, 1 gram could supply 10 to 20 hits, if not more, and the high would last for "[s]everal hours." On cross-examination Canales testified that he was in a conspiracy with Aguirre-Orozco and Carden.

The government called Robert B. Rist, a sergeant with the Lakeland Police Department, who testified as follows. He described an incident where he and another officer detained an individual after he got into a stolen vehicle. Inside the vehicle, officers found a safe, and inside the safe, they found, inter alia, a loaded handgun, a portable digital scale, a spoon, a card and letter addressed to Carden, and a paper with names and dollar amounts. In his experience, he believed the paper with the names and dollar amounts was a "list of sales of illegal narcotics for money that was owed to a dealer."

On the second day of trial, the government called Jason Fallin, who testified as follows. He was serving a 97-month sentence for conspiracy to distribute

5

methamphetamine and was testifying as part of his plea agreement in the hopes of receiving a sentence reduction. He had known Carden for two years and at some point began to buy small amounts—one-eighth of an ounce—of methamphetamine from Carden. Fallin began to receive between a quarter of an ounce up to an ounce from Carden for one or two months before Fallin got arrested, and Carden "fronted" him the methamphetamine. It was "well known around town" that Aguirre-Orozco was Carden's source of supply, he had seen Carden give Aguirre-Orozco a "stack of cash" on one occasion, and a large amount of methamphetamine, possibly a pound, was at the site when the money was exchanged. Fallin also saw Aguirre-Orozco at Fallin's girlfriend's house, and she obtained methamphetamine from Aguirre-Orozco, although he had not seen a transaction because they were conducted in a separate room.

The government called William Watson, who testified as follows. He recently had been released from prison for violating his probation on a theft charge, and he had been told that any testimony he gave could not be used against him. He had sold Carden three or four stolen "bikes" in exchange for a little less than a quarter-ounce of methamphetamine. He also bought methamphetamine from Carden over a year's time and had seen Carden sell methamphetamine to other people, including Canales, who he believed was Carden's partner.

The government called Terry Oliver Gilmore, who testified as follows. He was serving a 28-month prison sentence for theft, drug, and traffic offenses, and he was told that the testimony he gave would not be used against him. He had a drug relationship with Carden and initially received 3.5-gram amounts of methamphetamine from him, which he consumed or sold. He then began to receive larger amounts of methamphetamine from Carden, and the largest amount he received was one-half pound on one occasion. Carden told him that Carden received the methamphetamine from Aguirre-Orozco. Gilmore had seen what Carden told him was eight pounds of methamphetamine when two individuals drove up in a car and pulled off the bumper to retrieve the methamphetamine, and Carden, Aguirre-Orozco, and another individual were present on this occasion. Carden told Gilmore that, at his peak, Carden was moving four pounds of methamphetamine a day.

The government called Charlie Thomas Freeman, who was on probation for a state methamphetamine conviction, and he testified as follows. At the time of his arrest, he was delivering methamphetamine to people that would sell it on the street. Aguirre-Orozco was his methamphetamine supplier, and he had received a quarter-pound of methamphetamine from Aguirre-Orozco, which led to his arrest. He had been dealing with Aguirre-Orozco about two-and-a-half weeks before his

7

arrest. During that period, he bought methamphetamine from Aguirre-Orozco almost every day. He purchased one ounce for four or five days, then moved to two ounces, and bought a quarter-pound on one occasion. He used methamphetamine with Aguirre-Orozco every time that he saw him, and Aguirre-Orozco shared the methamphetamine with him. Freeman owed Aguirre-Orozco money when he was arrested, and he agreed with law enforcement to contact Aguirre-Orozco with regard to the debt. Aguirre-Orozco had told him that Aguirre-Orozco had paid for Carden's attorney.

The government called Derrick Gulledge, a narcotics detective with the Lakeland Police Department, who testified as follows. He participated in the arrest of Charlie Freeman and seized methamphetamine from him. Following the arrest, Freeman agreed to cooperate and to talk with his source of supply. Freeman attempted to call Aguirre-Orozco two or three times during the course of cooperation, and during two separate calls, Freeman attempted to pay back a debt, and Aguirre-Orozco told him to take the money to another individual. In a call made on March 20, 2008, Freeman also advised Aguirre-Orozco that the police were looking for Aguirre-Orozco in connection with methamphetamine trafficking, and Aguirre-Orozco said he would meet Freeman at a later time. After the March 20 call, Detective Gulledge went out to surveil Aguirre-Orozco, who was

8

driving in a rental vehicle, and Detective Gulledge ultimately followed him to a residential neighborhood, where Detective Gulledge found the car parked and unoccupied. His initial reaction was that the driver had "obviously fled from it." He used his judgment to pursue the believed flight path and discovered a small bag of methamphetamine and keys that ultimately fit the car that Aguirre-Orozco had been driving.

The government called Daniel McDonough, an agent with the Drug Enforcement Administration, who testified as follows. He assisted in the investigation of Aguirre-Orozco on March 20, 2008, and became involved when saw Aguirre-Orozco running across the road. When Agent McDonough turned the corner, he saw Aguirre-Orozco jump over two fences. Aguirre-Orozco then grabbed a bicycle and headed away from Agent McDonough, and after about 100 meters, Aguirre-Orozco got off the bike and started running. At that point, Agent McDonough got out of his vehicle and commanded Aguirre-Orozco to stop. After Aguirre-Orozco hopped over another chain-link fence, he appeared to be out of breath and stopped running, and Aguirre-Orozco eventually was arrested.

The government called Jasmine Luker, who was serving one year and one day for violating her probation for drug possession charges, and she testified as follows. She was told by law enforcement that they were not interested in seeking

9

federal drug charges against her. She was addicted to methamphetamine and began selling it in order to get money to buy more. She had lived with Carden and was his girlfriend, and he sometimes provided her with methamphetamine. She witnessed "[a] lot" of drug-trafficking activity when she lived with Carden. At some point, she and Carden began to live in hotels because they were on the run, and she would pick up and deliver money for him in order to keep the methamphetamine business going. She saw Carden and Aguirre-Orozco exchange methamphetamine a couple of times a week, and, based on her observations, Aguirre-Orozco was supplying Carden. She also had observed Carden exchange methamphetamine with two other individuals. The safe was hers and Carden's at the time it was taken. Carden kept records of the drug debts owed to him for his methamphetamine sales, which included people's names and the amounts they owed. She had lied under oath on a previous occasion when she gave a statement because she was trying to keep Carden out of trouble. Carden wrote her letters while he was incarcerated. She had reviewed, redacted, and edited copies of the letters. The government moved the letters into evidence, and there were no objections from the defense.

Carden's letters include the following statements and content: (1) "I really feel like shit, cause yall are the most important people in my life, and I put $ ahead

10

of feelings. That ain't right neither. I got so carried away with worrying about $ and all that shit that can be replaced, that I ne[]glected the people that could never be replaced. That was a bad mistake. But I guess we learn from our mistakes"; (2) Carden would have to "catch a charge" if two government witnesses were placed in his cell; (3) "Anyways you know that [Aguirre-Orozco] is next door. They are trying to build a case on us, But hopefully, everything will be OK"; (4) Carden was afraid that another man was cooperating against him; (5) "I knew what time it was before they caught me"; (6) Luker should not cooperate with law enforcement; (7) Carden is "not fucking around NO MORE"; (8) Aguirre-Orozco had "done all he is going to do"; and (9) Carden's job was too dangerous to bring Luker with him. On the third day of trial, Luker testified as to various statements in Carden's letters.

The government called Glenn James, an officer with the Lakeland Police Department, who testified as follows. The parties stipulated that the amount of methamphetamine found on the date of Aguirre-Orozco's arrest was 5.4 grams of pure methamphetamine. He participated in the aerial surveillance of Aguirre-Orozco that led to his arrest. He described Aguirre-Orozco's driving, stated that Aguirre-Orozco knew that officers were following him, and described how Aguirre-Orozco eventually stopped his vehicle and fled on foot. Officer

11

James also testified that, in a recorded telephone conversation, Carden talked about money that Aguirre-Orozco had paid for Carden's defense attorney in a state case.

The government then sought to introduce copies of Aguirre-Orozco's judgments for the following prior state-court felony convictions: (1) 2000 convictions for possession of a controlled substance with intent to sell and possession of a controlled substance, for which he was arrested in 1999, (2) a 2003 conviction for possession of a controlled substance, and (3) a 2004 conviction for possession of a controlled substance. Aguirre-Orozco, through counsel, renewed his objection to entering the convictions into evidence. The court told the jury,

> you must not consider any of this evidence in deciding if [Aguirre-Orozco] committed the acts charged in the Indictment. You may, however, consider this evidence for other very limited purposes . . . to determine whether the Defendant had the state of mind or intent necessary to commit the crimes charged in the Indictment.

At that point, the government rested.

Counsel for Carden moved for a judgment of acquittal, pursuant to Fed.R.Crim.P. 29. With respect to Count 1, counsel argued that all of the evidence supporting the conviction came "exclusively from the testimony of individuals who have struck deals with the Government and have a motive to falsely implicate," and that their testimony differed "radically" from each other's, such that no reasonable juror could find Carden guilty beyond a reasonable doubt. The

12

court stated that, looking at the evidence in the light most favorable to the government, there was sufficient evidence for a reasonable jury to find Carden guilty of the charge.

Counsel for Aguirre-Orozco called Elia Estrada, Aguirre-Orozco's sister, who testified that Aguirre-Orozco had a problem taking drugs and that he was in the United States illegally. Counsel then called Michelle Campbell, who testified that she knew Aguirre-Orozco and had a methamphetamine problem, but that she never bought methamphetamine from Aguirre-Orozco or did drugs with him. At that point, Aguirre-Orozco rested.

In discussing the proposed jury instructions, the government indicated that it sought to have a jury instruction on Aguirre-Orozco's flight as an indication of his guilt. Counsel for Aguirre-Orozco objected, arguing that Aguirre-Orozco was arrested for being an illegal alien with no valid driver's license, such that his flight did not pertain to the instant case. The court stated that it was going to give the instruction.

On the fourth day of trial and after the parties gave their closing arguments, the court instructed the jury and included the following instruction:

> Now, with regard to – this applies to the Defendant Aguirre-Orozco. Intentional flight by a person immediately after a crime has been committed is not, of course, sufficient in itself to establish the guilt of that person, but intentional flight under those circumstances is a fact

13

which, if proved, may be considered by the jury in light of all the other evidence in the case in determining the guilt or innocence of that person.

Whether or not the Defendant's conduct constituted flight is exclusively for you as a jury to determine, and if you do so determine that flight showed consciousness of guilt on the Defendant's part, the significance to be attached to that evidence is also a matter exclusively for you as a jury to determine.

I do remind you that in your consideration of any evidence of flight, if you should find there was flight, you should consider that there may be reasons for this which are fully consistent with innocence. And may I suggest to you that a feeling of guilt does not necessarily reflect actual guilt of a crime which you may be considering.

Counsel for Aguirre-Orozco renewed the objection to the flight instruction, and the court overruled the objection.

The jury found Carden and Aguirre-Orozco guilty on both counts, and specifically found that the offense charged in Count 1 involved 500 grams or more of a substance containing methamphetamine, and, with respect to Aguirre-Orozco, that the offense charged in Count 5 involved 5 grams or more of methamphetamine. The court sentenced both Carden and Aguirre-Orozco to total terms of life imprisonment.

**II.**

**A.     Carden**

**Denial of Judgment of Acquittal as to Count 1**

"We review de novo the denial of a motion for acquittal and the sufficiency of the evidence to sustain a conviction, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict." United States v. Tampas, 493 F.3d 1291, 1297-98 (11th Cir. 2007) (quotation omitted).  The jury only must reasonably interpret the evidence, and the government does not need to exclude every reasonable hypothesis of innocence.  Id. at 1298.  We affirm a conviction "if a reasonable juror could have concluded that the evidence established [Carden's] guilt beyond a reasonable doubt."  Id.

To support a conspiracy conviction under 21 U.S.C. § 846, the government must prove beyond a reasonable doubt that: (1) a conspiracy existed; (2) the defendant knew of the essential objectives of the conspiracy; and (3) the defendant participated in the conspiracy knowingly and voluntarily.  United States v. Calderon, 127 F.3d 1314, 1326 (11th Cir. 1997).  The government does not need to prove that the defendant knew of all the details or participated in every aspect of the conspiracy.  United States v. Miranda, 425 F.3d 953, 959 (11th Cir. 2005).

15

Circumstantial evidence often is necessary to prove the elements of a conspiracy because a conspiracy is a predominantly mental offense. United States v. Arias-Izquierdo, 449 F.3d 1168, 1182 (11th Cir. 2006). "While the existence of a simple buyer-seller relationship alone does not furnish the requisite evidence of a conspiratorial agreement, an agreement to distribute drugs may be inferred when the evidence shows a continuing relationship that results in the repeated transfer of illegal drugs to a purchaser." United States v. Thompson, 422 F.3d 1285, 1292 (11th Cir. 2005) (quotations, citation, and alteration omitted).

Here, the evidence was sufficient for a jury to find Carden guilty of the conspiracy charge beyond a reasonable doubt, as the evidence of Carden's relationship with Aguirre-Orozco was sufficient for the jury to infer that they had entered an agreement to distribute methamphetamine. Canales testified that he bought large quantities—one-fourth of a pound to one pound—of methamphetamine from Aguirre-Orozco for six to eight months, and that Carden was Canales's partner, which meant that they would pool their money to buy larger amounts of drugs, distribute them, and share the profit. Although Canales did not directly testify that he and Carden, as partners, bought drugs from Aguirre-Orozco, the jury could reasonably infer that Aguirre-Orozco supplied some of the drugs for their distribution. Fallin testified that it was known that Aguirre-Orozco was

16

Carden's supplier, and that he had seen Carden give Aguirre-Orozco a "stack of cash" on one occasion in the presence of possibly a pound of methamphetamine. Gilmore testified that he purchased methamphetamine from Carden, up to one-half pound, he collected money for Carden, and Carden told him that Aguirre-Orozco was his supplier. In addition, Gilmore described an incident when Carden, Aguirre-Orozco, and another individual were present when what Carden told him was eight pounds of methamphetamine was retrieved from a vehicle. Finally, Luker testified that she saw Carden and Aguirre-Orozco exchange methamphetamine a couple of times a week, and based on her observations, Aguirre-Orozco was supplying Carden.

This testimony supports that Aguirre-Orozco sold Carden large amounts of methamphetamine on many occasions, and that Carden, in turn, sold the methamphetamine to others, and a jury could infer, based on this evidence, that Carden and Aguirre-Orozco had entered an agreement to distribute methamphetamine. Cf. United States v. Dekle, 165 F.3d 826, 829-30 (11th Cir. 1999) ("When two parties are charged with agreeing to distribute drugs, evidence that the parties understood their transactions to do no more than support the buyer's personal drug habit is antithetical to a finding of conspiracy."). Thus, the evidence, which this Court must take in the light most favorable to the government,

17

supports that their relationship was not that of a mere buyer and seller, but more of a "continuing relationship that result[ed] in the repeated transfer of illegal drugs to a purchaser." Thompson, 422 F.3d at 1292 (holding that "a jury could find beyond a reasonable doubt that Mr. Stratton agreed with Ms. Thompson to distribute cocaine and crack" given the evidence of "the existence of a continuing relationship between Mr. Stratton and Ms. Thompson in which Mr. Stratton would supply Ms. Thompson cocaine, the bulk of which she would distribute to customers . . ."). Therefore, sufficient evidence supported Carden's conspiracy conviction, and the district court did not err in denying his motion for judgment of acquittal. See Tampas, 493 F.3d at 1297-98. Accordingly, we affirm Carden's conviction.

B.    Aguirre-Orozco

     i.    Flight Instruction

We review a district court's jury instructions under an abuse-of-discretion standard. United States v. Williams, 541 F.3d 1087, 1089 (11th Cir. 2008), petition for cert. filed, (U.S. Mar. 27, 2009) (No. 08-10821). District courts have broad discretion in crafting jury instructions as long as the charge accurately reflects the law and the facts. United States v. Kennard, 472 F.3d 851, 854 (11th Cir. 2006). An error in jury instructions does not mandate reversal unless there is a

18

reasonable likelihood that the error affected the defendant's substantial rights.

Williams, 541 F.3d at 1089.

"Evidence of flight is admissible to demonstrate consciousness of guilt and thereby guilt." Id. (quotation omitted). In United States v. Myers, former Fifth Circuit held that the

> probative value [of flight] as circumstantial evidence of guilt depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.

United States v. Myers, 550 F.2d 1036, 1049 (5th Cir. 1977). An instruction on flight is proper if the evidence supports all four of the necessary inferences. Id. at 1050. "The more remote in time the alleged flight is from the commission or accusation of an offense, the greater the likelihood that it resulted from something other than feelings of guilt concerning that offense." Id. at 1051. In addition, "[t]he probative value of such evidence obviously is diminished if the defendant has committed several unrelated crimes . . . ." United States v. Blakey, 960 F.2d 996, 1000 (11th Cir. 1992).

Here, the evidence was sufficient for a reasonable juror to infer that Aguirre-Orozco's flight resulted from his consciousness of guilt for the crimes for

19

which he was being tried. First, the evidence shows that Freeman informed Aguirre-Orozco, by telephone, that police were looking for Aguirre-Orozco in connection with methamphetamine trafficking. Later that same day, Aguirre-Orozco fled from law enforcement and ultimately was arrested. In addition, 5.4 grams of pure methamphetamine was found in connection with Aguirre-Orozco's arrest. Canales testified that 1 gram could supply at least 10 to 20 hits, that 1 hit was all it took to get high for several hours, and that Aguirre-Orozco shared methamphetamine with him and others. This evidence supports that, at the time Aguirre-Orozco fled from law enforcement, he was aware that law enforcement officers were pursuing him in connection with methamphetamine trafficking and was in possession of a significant quantity of methamphetamine, which the jury could conclude was intended for distribution. This was sufficient for a jury to infer that Aguirre-Orozco fled because he was conscious that he was committing the crime of possession with intent to distribute methamphetamine, such that the flight instruction was proper. See Williams, 541 F.3d at 1089 ("Because a reasonable jury could conclude, based on the evidence presented, that Defendant fled the police to avoid the charged crime, we discern no abuse of discretion in the district court's decision to give the flight instruction.").

Although Aguirre-Orozco attempts to use his status as an illegal alien to negate the permissible inferences to be drawn from the evidence, the fact that he was in the country illegally did not forbid the jury from concluding that the evidence supported that he fled based on his consciousness of guilt for the methamphetamine offense. See United States v. Martinez, 83 F.3d 371, 377 (11th Cir. 1996) ("That Gallo knew he had also committed a burglary does not detract from the evidence that Gallo was attempting to evade arrest for committing a drug offense and for being a felon in possession of a firearm."). Furthermore, the "district court correctly cautioned the jury that it was up to them to determine whether the evidence proved flight and the significance, if any, to be accorded such a determination." Kennard, 472 F.3d at 855 (quotation omitted). Thus, Aguirre-Orozco cannot show that the district court abused its discretion in instructing the jury that it could consider his flight in determining whether he was guilty of the crimes for which he was being tried. See Williams, 541 F.3d at 1089.

**ii.     Admission of Carden's statements**

We apply plain-error review when a defendant fails to object to an evidentiary ruling. United States v. Turner, 474 F.3d 1265, 1275-76 (11th Cir. 2007) (holding that a Bruton claim should be reviewed for plain error when a defendant failed to contemporaneously object to the admission of the evidence).

21

To establish plain error, a defendant must show an "(1) error, (2) that is plain and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. at 1276 (quotation omitted). "Where errors could have cut either way and uncertainty exists, the burden is the decisive factor in the third prong of the plain error test." Id. (quotation and ellipsis omitted).

In Bruton, the Supreme Court "held that despite a limiting instruction, the admission of a 'powerfully incriminating extrajudicial statement' of a non-testifying co-defendant violates a defendant's Sixth Amendment right to confront and cross-examine an adverse witness." Id. at 1277 (citing Bruton, 391 U.S. at 135-36, 88 S.Ct. at 1628). "A statement is 'powerfully incriminating' under Bruton if it directly implicates the defendant." Id. It follows that testimony that does not implicate a codefendant directly does not violate Bruton. See id. at 1278 ("Thorp's testimony initially did not violate Bruton, because it did not directly implicate Turner."). Furthermore, to violate Bruton, a statement must be "facially incriminating," and a statement is not facially incriminating if it has to be linked to other evidence in order to be inculpatory. United States v. Adams, 74 F.3d 1093, 1099 (11th Cir. 1996).

Here, the statements and topics about which Aguirre-Orozco complains do not implicate Aguirre-Orozco directly, and he cannot show that his substantial rights were affected by their admission. First, with respect to the nine statements and topics Aguirre-Orozco identifies, Carden mentions Aguirre-Orozco in only two, and none of the others implicates Aguirre-Orozco on their face. United States v. Beard, 775 F.2d 1577, 1581 (11th Cir. 1985) (finding no Bruton violation when a defendant's "question to the F.B.I. agent did not directly name the defendant Roberts, nor d[id] it necessarily implicate Roberts in the commission of the bank robbery"). In the first statement that mentions Aguirre-Orozco, Carden states that Aguirre-Orozco was in the cell next to him and that law enforcement was trying to build a case on them. This was not facially inculpatory, and other testimony established that Carden and Aguirre-Orozco knew each other and that Aguirre-Orozco had been arrested. The next statement that mentions Aguirre-Orozco was Carden's statement that Aguirre-Orozco had "done all he is going to do." In order for this statement to make sense, it had to be linked with other testimony that Aguirre-Orozco paid Carden's attorney a certain amount of money in a previous state case. This statement also was not facially incriminating, as it required other evidence in order to make sense, and did not suggest that Aguirre-Orozco was guilty of the charges for which he was then being tried. See

id. (noting that, to show a violation of <u>Bruton</u>, the defendant must show that "the out-of-court statement by his co-defendant [] directly implicated him and that the statement standing alone was clearly inculpatory"). Thus, Aguirre-Orozco failed to show that the district court committed an error under <u>Bruton</u>.

Furthermore, even if the statements were admitted in violation of <u>Bruton</u>, Aguirre-Orozco cannot show that his substantial rights were violated because of the overwhelming evidence of his guilt. The statements were unrelated to Aguirre-Orozco's possession charge, and, with respect to the conspiracy charge, the evidence at trial supported that Aguirre-Orozco was involved in a methamphetamine-distribution conspiracy. Canales testified that he bought pounds of methamphetamine from Aguirre-Orozco, and that Canales was a part of a conspiracy with Aguirre-Orozco and Carden. Fallin testified that he knew that Aguirre-Orozco was Carden's source of supply and had seen Aguirre-Orozco and Carden exchange money in the presence of large amounts of drugs. Gilmore testified that Carden sold drugs that he got from Aguirre-Orozco. Freeman testified that Aguirre-Orozco was his supplier and that Aguirre-Orozco shared methamphetamine with him. Finally, Luker testified that Aguirre-Orozco supplied Carden with drugs. This evidence of Aguirre-Orozco's guilt was overwhelming apart from the admitted statements, such that Aguirre-Orozco cannot show that any

Bruton error affected his substantial rights. See Turner, 474 F.3d at 1278 (holding that Turner did not show that Bruton error affected her substantial rights because, "independent of the challenged testimony, the government presented overwhelming evidence in support of Turner's convictions"). Accordingly, we affirm as to this issue.

### iii.    Rule 404(b)

We review a district court's evidentiary rulings under an abuse-of-discretion standard. United States v. Brannan, 562 F.3d 1300, 1306 (11th Cir. 2009). Under this deferential standard, we must affirm unless we find the district court made "a clear error of judgment, or has applied the wrong legal standard." Id. (quotation omitted).

Rule 404(b) provides,

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ."

Fed.R.Evid. 404(b). We have stated that "Rule 404(b) is a rule of inclusion, and that accordingly 404(b) evidence, like other relevant evidence, should not lightly be excluded when it is central to the prosecution's case." United States v. Jernigan, 341 F.3d 1273, 1280 (11th Cir. 2003) (quotation omitted).

In reviewing 404(b) decisions, we apply a three-part test for admissibility of such evidence: (1) the evidence must be relevant to an issue other than the defendant's character; (2) there must be sufficient proof so that the factfinder could find that the defendant committed the extrinsic act; and (3) the evidence must possess probative value that is not substantially outweighed by undue prejudice.

United States v. Perez, 443 F.3d 772, 779 (11th Cir. 2006). Here, Aguirre-Orozco does not challenge the second prong of the three-part test.

We have stated that "in every conspiracy case, a not guilty plea renders the defendant's intent a material issue" and that "[e]vidence of such extrinsic evidence as may be probative of a defendant's state of mind is admissible unless the defendant affirmatively takes[] the issue of intent out of the case." United States v. Matthews, 431 F.3d 1296, 1311 (11th Cir. 2005) (quotation, alterations, and ellipsis omitted); see also United States v. Butler, 102 F.3d 1191, 1195 (11th Cir. 1997) ("Intent is always at issue when a defendant pleads not guilty to a conspiracy charge.").

Under the third prong of the balancing test, "the probative value of the evidence must not be substantially outweighed by unfair prejudice. Jernigan, 341 F.3d at 1282 (quotation omitted) (emphasis in original). This determination lies within the district court's discretion and involves an assessment of all of the circumstances surrounding the prior acts, including the government's need, the similarity between the prior acts and the charged offense, and the temporal

remoteness between the events.  Id.  We have noted that "temporal remoteness is an important factor" and stated that a defendant "bears a heavy burden in demonstrating an abuse of the court's broad discretion in determining if an extrinsic offense is too remote to be probative."  Matthews, 431 F.3d at 1311 (quotation omitted).

Here, under the first prong of our Rule 404(b) test, Aguirre-Orozco's prior convictions for controlled-substance offenses were relevant to show Aguirre-Orozco's intent with respect to the instant drug-conspiracy charges, as both offenses involved drugs.  See id. (holding that an "arrest for distribution of cocaine was relevant to the intent at issue in the charged conspiracy to distribute cocaine").  Although Aguirre-Orozco challenges the introduction of the convictions because they did not identify the specific controlled substance involved, we have stated that its "precedent regards virtually any prior drug offense as probative of the intent to engage in a drug conspiracy."  Id.; cf. United States v. Baker, 432 F.3d 1189, 1207 (11th Cir. 2005) (holding that evidence of a prior murder was unrelated to the drug- or firearm-related charges, such that it was inadmissible under Rule 404(b)).  Thus, Aguirre-Orozco's prior convictions were relevant under the first prong of our Rule 404(b) test.  See Perez, 443 F.3d at 779.

Under the third prong of the test, Aguirre-Orozco has not shown that the district court abused its discretion in determining that the probative value of his prior convictions was not substantially outweighed by unfair prejudice. See id. First, Aguirre-Orozco's prior convictions for possession of a controlled-substance with intent to sell and possession of a controlled substance were similar to the drug-conspiracy and drug-possession charges for which Aguirre-Orozco was being tried. See Matthews, 431 F.3d at 1311; see also United States v. Lampley, 68 F.3d 1296, 1300 (11th Cir. 1995) (determining in a trial for cocaine trafficking that the district court did not abuse its discretion in finding that the probative value of evidence of prior marijuana deals was not substantially outweighed by the danger of unfair prejudice). In addition, Aguirre-Orozco was arrested in connection with the earliest prior conviction in 1999, which was approximately nine years before the grand jury handed down the indictment on the instant charges, and this Court has held that longer periods did not render admission improper. See Lampley, 68 F.3d at 1300 (holding that a time period of approximately 15 years was not too remote); see also United States v. Edouard, 485 F.3d 1324, 1346 (11th Cir. 2007) (citing cases that held that 5-, 6-, and 15-year time gaps were not too remote for proper consideration).

In addition, the court gave the jury a limiting instruction after admitting the evidence of the prior convictions, informing the jury that it could not consider the convictions as evidence that Aguirre-Orozco committed the acts charged in the indictment, but could consider them to determine whether he had the state of mind or intent necessary to commit the charged crimes. This limiting instruction further supports that the court did not abuse its discretion in allowing the evidence to be admitted. See United States v. Lamons, 532 F.3d 1251, 1267 (11th Cir.) ("Any prejudicial value was further reduced by the limiting instruction given by the district court during the jury charge."), cert. denied, 129 S.Ct. 524 (2008). Therefore, because Aguirre-Orozco's prior convictions were relevant to an issue other than his character and their probative value was not substantially outweighed by unfair prejudice, the district court did not abuse its discretion under Rule 404(b) in admitting the prior convictions into evidence. Accordingly, we affirm as to this issue.

## III.

In summary, we hold that a reasonable juror could conclude that Carden was guilty of Count 1 beyond a reasonable doubt, such that the district court did not err in denying his motion for a judgment of acquittal. With respect to Aguirre-Orozco, the district court did not abuse its discretion in instructing the jury that it could

29

consider his flight because the evidence was sufficient for a reasonable juror to infer that his flight resulted from his consciousness of guilt for the crimes for which he was being tried. The district court did not plainly err in allowing Carden's statements to be read into evidence because the statements were not facially incriminating and the evidence of Aguirre-Orozco's guilt was overwhelming apart from the statements. Finally, because Aguirre-Orozco's prior convictions were relevant to an issue other than his character and their probative value was not substantially outweighed by unfair prejudice, the district court did not abuse its discretion in admitting the prior convictions into evidence.

Accordingly, upon review of the record and consideration of the parties' briefs, we affirm Carden's and Aguirre-Orozco's convictions.

**AFFIRMED.**