[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-15534
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 20, 2010
JOHN LEY
CLERK

D. C. Docket No. 08-00206-CR-ODE-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

AGHEDO PIUS IYAMU,
a.k.a. Amit Chopra,
a.k.a. Peter Charles Davis,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 20, 2010)

Before EDMONDSON, MARTIN and FAY, Circuit Judges.

PER CURIAM:

Aghedo Pius Iyamu appeals his fraud and identity theft convictions and his 70-month total sentence. Iyamu argues that the district court (1) erred by denying his motion for a mistrial based on the government's violation of Fed.R.Crim.P. 16; (2) the evidence was insufficient to support his aggravated identity theft convictions, because the government failed to prove that he knew his victims were real people; (3) the district court erred in applying a two-level U.S.S.G. § 3B1.1(c) enhancement, because he did not play a managerial or supervisory role in the offense; and (4) his 70-month sentence is unreasonable. For the reasons set forth below, we affirm.

## I.

Iyamu pled not guilty and proceeded to trial on four counts of credit card fraud, in violation of 18 U.S.C. § 1029, (Counts 1, 3, 5, and 7); four counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1), (Counts 2, 4, 6, and 8); two counts of bank fraud, in violation of 18 U.S.C. § 1344, (Counts 9 and 10); and one count of conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349 (Count 11).

The relevant facts established at trial are as follows. Chase Bank approved an online credit card submitted on September 30, 2007, in the name of Pam R. Rollins. Pamela Rollins Henritze, formerly known as "Pamela Rollins," testified

2

that she did not submit the application, which listed her correct social security number. A Chase Bank employee testified that the application most likely would have been declined if the social security number on the application did not correspond to other identifying information. Chase also approved an online credit card application in the name of Bhavesh Amin. Amin testified that he did not submit the Chase application, although his social security number was correctly listed on the application.

Amit Chopra submitted an online credit card application to American Express. American Express approved the application and mailed Chopra's credit card on December 4, 2007. On December 21, 2007, Chopra reported to American Express that he never received the card. American Express mailed a second card to Chopra, but failed to terminate the first credit card. The account number on the first Chopra credit card ended in 1009. At 1:47 p.m. on December 19, 2007, the Chopra card ending in 1009 was used to make a $10,940 purchase from a Louis Vuitton store. Amit Chopra testified that he did not recognize any of the charges or the signature on the card ending in 1009.

Robert Benjamin, a loss prevention manager for Donna Karan International, testified that, in January 2008, he traveled to the Atlanta Louis Vuitton store to review video surveillance footage corresponding to the December 19, 2007

purchase. Based on his experience with the videotaping system used at the Atlanta Louis Vuitton store, Benjamin was aware that the time stamp on the surveillance video was not always accurate. Benjamin discovered that the time stamp on the Louis Vuitton surveillance video was not correct, but he was able to calculate the time differential and locate the transaction for which he was searching. Benjamin acknowledged that the time stamp on a Louis Vuitton receipt indicated that the December 19, 2007, purchase was made at a different time than was indicated by the time stamp on the surveillance video. The government played the surveillance video clip, which, according to Benjamin, showed Iyamu speaking with store employees Jennifer Agrippa and Carlton Maxey.

On cross-examination, Benjamin testified that he believed the Louis Vuitton receipt reflected the actual time of the purchase, although he did not check the register to make sure its time stamp was accurate. Benjamin noted that there was a little over three hours difference between the time on the receipt and the time stamp on the video.

Iyamu moved for a mistrial, arguing that the government had violated Fed.R.Crim.P. 16, which provides that the government must permit the defendant to inspect tangible objects within its custody if it intends to use the item in its case-in-chief. *See* Fed.R.Crim.P. 16(a)(1)(E)(ii). Iyamu noted that the government

4

had disclosed the Louis Vuitton surveillance video during discovery, but had not disclosed that a witness would testify that the time stamp on the video was inaccurate. The government responded that it provided Iyamu with the Louis Vuitton receipt documenting the purchase in question, as well as the American Express records, which listed a time consistent with the receipt but inconsistent with the video time stamp. It argued that it did not have a duty to point out that the times on the receipt, the American Express records, and the videotape were all different. The court determined that the government "made appropriate disclosures under Rule 16" and denied Iyamu's motion for a mistrial.

The evidence also showed that Bank of America approved a credit card application in the name of DeAngelo Hall. Hall testified that he never applied for a Bank of America credit card, even though the application submitted in his name accurately listed his social security number.

Bank of America also issued a credit card to Harris B. Ray. Bobby Ray Harris, Jr. testified that the Ray credit card application listed his social security number, although he did not submit the application. A Bank of America employee testified that, to open an account, an applicant had to provide a social security number and some information corresponding with the social security number so that the bank could check the individual's credit history.

5

Carlton Maxey, a former Louis Vuitton employee, testified that he had agreed to purchase Louis Vuitton luggage for one of Iyamu's colleagues using his store discount. On October 9, 2007, Iyamu gave Maxey a $10,700 check for the purchase. Maxey deposited the check, but a hold was placed on it. Before Maxey could purchase the luggage, Iyamu informed Maxey that the check had cleared and asked Maxey to return the money. Maxey withdrew the money from the bank, met Iyamu, and gave him the money in an envelope. Maxey paid Iyamu $10,000 and Iyamu gave him a $700 tip. Iyamu later asked Maxey to deposit into Maxey's account a check for $74,600. Iyamu did not explain to Maxey why he wanted the check deposited. Maxey deposited the check, which was made out to him, into a bank account that he had opened a month earlier. A hold was placed on the check for 14 days and the check never cleared because of insufficient funds. When Maxey opened the bank account, he received a "starter kit" containing starter checks, deposit slips, an ATM card, and a PIN number. At Iyamu's request, Maxey gave the starter kit to Iyamu.

Maxey stated that he did not make a December 6, 2007, deposit of $2,500, or a January 16, 2008, deposit of $2,400 into his bank account. He also denied depositing a $48,200 check from Pam Rollins into his account. Maxey testified that he did not make any of the check card transactions listed on his account

6

statement between December 7 and December 14, 2007. When Maxey informed Iyamu of these transactions, Iyamu told Maxey that his business partner had probably made the deposits and that he would take care of it.

At one point, Iyamu introduced Maxey to a man Iyamu identified as having the last name Chopra. Iyamu wished to put Chopra on consignment, meaning that Louis Vuitton would retain Chopra's credit card information on file. Under this method, the merchandise would be sent to a customer and the credit card information would be entered manually. Maxey stated that, on December 14, 2007, Iyamu made a purchase using Chopra's credit card. On December 19, 2007, using the same credit card, Iyamu purchased an $18,000 watch from Louis Vuitton. Iyamu used two gift cards so that he only had to pay $10,940 for the watch. Iyamu came into the store to pick up the watch. The government played the Louis Vuitton surveillance video, which, according to Maxey, depicted the watch purchase. Maxey testified that he had pled guilty to one count of conspiracy to commit bank fraud for his participation in the instant offense. He acknowledged that he had also been arrested in 1998 for fraud.

After the testimony had concluded, Iyamu moved for a directed verdict of acquittal as to all counts of the indictment. The court denied Iyamu's motion and the jury found him guilty on all 11 counts.

According to the presentence investigation report ("PSI"), the applicable statutory penalty of at least two years' imprisonment became the guideline range for Counts 2, 4, 6, and 8. Iyamu's total offense level for Counts 1, 3, 5, 7, 8, 10, and 11, was 23. This included a two-level increase, pursuant to § 2B1.1(b)(2)(A), because his offense involved more than ten victims. Iyamu also received a two-level enhancement, pursuant to U.S.S.G. § 3B1.1(c), because he "enrolled Carlton Maxey to participate in the offense and directed him to provide the account access information, pin number and debit card to him when the fraudulent bank account was established." Iyamu's total offense level of 23 combined with his criminal history category of I to yield a guideline imprisonment range of 46 to 57 months.

Iyamu objected to the two-level increase he received under § 2B1.1(b)(2)(A), arguing that his offense did not involve more than ten victims. He also objected to the two-level increase he received under § 3B1.1(c), arguing that he did not recruit or enroll Maxey as a participant in the offense. He contended that Maxey's testimony, which was the only evidence on this point, did not support the enhancement because it was not credible.

At sentencing, the government conceded that it could not prove that Iyamu's offense involved at least ten victims and the court determined that it would not

8

apply the two-level § 2B1.1(b)(2)(A) enhancement. Iyamu also argued against applying the two-level § 3B1.1(c) aggravating role enhancement, because Maxey's testimony was not credible. The government responded that the jury's guilty verdict indicated that it had found Maxey's testimony to be credible. It noted that Maxey testified that Iyamu provided him with checks, directed him to deposit the checks into his account, and directed him to withdraw money from his account. Based on the trial testimony, the court found that "while . . . Iyamu and . . . Maxey were partners in crime, . . . it is fair to characterize . . . Iyamu as the leader between the two of them." It therefore applied the two-level aggravating role enhancement.

Based on the court's findings, Iyamu was subject to a total offense level of 21, a criminal history category of I, and a guideline range of 37 to 46 months' imprisonment. The court asked Iyamu for his sentencing recommendation. Iyamu responded that a sentence of 37 months' imprisonment, followed by the mandatory 24 months imprisonment for the aggravated identity theft counts, would be reasonable. Iyamu noted that he had been in the country for 12 ½ years before his offense conduct began; he had no criminal history; he had four young children, all of whom were United States citizens; and he would be deported after serving his sentence. Iyamu also contended that, after he was convicted, he had offered to cooperate with the government.

9

The court sentenced Iyamu to a term of 46 months' imprisonment on each of Counts 1, 3, 5, 7, 9, 10, and 11, to run concurrently with each other, and to be followed by 24 months' imprisonment on Count 2, to run consecutively with the other counts. The court also imposed a sentence of 24 months' imprisonment on Counts 4, 6, and 8, to run concurrently with each other and with the other counts.

## II.

### A. *Denial of Motion for Mistrial*

We review a district court's denial of a motion for a mistrial for an abuse of discretion. *United States v. Perez-Oliveros*, 479 F.3d 779, 782 (11th Cir. 2007).

Rule 16 provides, in relevant part, that:

> Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and . . . (ii) the government intends to use the item in its case-in-chief at trial.

Fed.R.Crim.P. 16(a)(1)(E). Rule 16(a)(2) specifically provides that "this rule [does not] authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500." Fed.R.Crim.P. 16(a)(3); see 18 U.S.C. § 3500 (providing that the defendant may be entitled to a government witness's statements and reports after the witness has testified on

direct examination).

The government's failure to disclose Benjamin's testimony regarding the inaccuracy of the time stamp, or to inform Iyamu that the time stamp was inaccurate, did not violate Rule 16. With respect to Benjamin's testimony, Rule 16(a)(3) specifically states that the discovery or inspection of statements by prospective government witnesses is not authorized by the Rule. Fed.R.Crim.P. 16(a)(3). The government also had no duty to inform Iyamu that the date stamp on the video was inaccurate, because Rule 16(a)(1)(E) simply required the government to allow Iyamu to inspect the video it intended to use in its case-in-chief. *See* Fed.R.Crim.P. 16(a)(1)(E). Thus, because Iyamu was provided with the video prior to trial, no Rule 16 violation occurred.

Iyamu relies on *United States v. Lee*, 573 F.3d 155 (3d Cir. 2009), in support of his contention that the government's failure to disclose the inaccuracy of the time stamp constituted a Rule 16 violation. In *Lee*, the government provided to the defendant a photocopy of the front of a hotel registration card, which indicated that the defendant had rented a hotel room for one night. *Id.* at 158. At trial, the jury examined the actual card and discovered writing on the back of the card indicating that the defendant had extended his stay. *Id.* at 159-60. The Third Circuit found that the government had committed a Rule 16 violation. *Id.* at 165. The facts of

11

the instant case are materially different than those involved in *Lee*. In *Lee*, the government violated Rule 16 by failing to provide an accurate copy of the hotel registration card that it presented at trial. *See id.* at 161. In contrast, Iyamu does not dispute that the video he was provided prior to trial was the actual video that was shown to the jury and, therefore, an accurate copy of the exhibit presented at trial. Thus, unlike the defendant in *Lee*, who had no opportunity to discover the writing on the back of the hotel registration card prior to trial, Iyamu had an opportunity to discover the time stamp discrepancy prior to trial by comparing it to other evidence. Accordingly, the district court did not err in denying Iyamu's motion for a new trial, because the government did not commit a Rule 16 discovery violation.

### B.     *Identity Theft Convictions – Sufficiency of the Evidence*

We review *de novo* "the denial of a motion for acquittal and the sufficiency of the evidence to sustain a conviction, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict." *United States v. Tampas*, 493 F.3d 1291, 1297-98 (11th Cir. 2007) (quotation omitted). We will affirm "if a reasonable juror could have concluded that the evidence established [the defendant's] guilt beyond a reasonable doubt." *Id.* at 1298.

12

To establish the crime of aggravated identity theft, the government must show that a defendant, in relation to certain felonies, "knowingly transfer[red], possesse[d], or use[d], without lawful authority, a means of identification of another person . . . ." 18 U.S.C. § 1028A(a)(1). The Supreme Court has held that "§ 1028A requires the Government to show that the defendant knew that the means of identification at issue belonged to another person." *Flores-Figueroa v. United States*, 556 U.S. __, 129 S.Ct. 1886, 1894, 173 L.Ed.2d 853 (2009). "[T]he government can rely on circumstantial evidence about an offender's misuse of a victim's identity to prove the offender knew the identity belonged to a real person." *United States v. Gomez-Castro*, 605 F.3d 1245, 1249 (11th Cir. 2010).

We have upheld an aggravated identity theft conviction where the defendant used a victim's social security card to obtain a driver's license, identity card, passport, and line of credit. *United States v. Holmes*, 595 F.3d 1255, 1256-58 (11th Cir. 2010). In *Holmes*, we rejected Holmes's argument that the government failed to explain how she obtained the victim's identification information, and that she was unaware of the rigorous verification procedures government officials use when issuing drivers licenses, identification card, and passports. *See id.* at 1258. We held that "a reasonable jury could have found that, after Holmes successfully used [the victim's] birth certificate to obtain a passport, Holmes knew that the birth

13

certificate and corresponding social security card belonged to a real person." *Id.*

Similarly, "a reasonable jury could have found that Holmes would not have sought

credit using [the victim's] personal information if Holmes were not confident that

[the victim] likely had an actual credit history." *Id.; see also Gomez-Castro*, 605

F.3d at 1249 (holding that the defendant's use of the victim's birth certificate and

social security card to successfully obtain a driver's license, two credit cards, and a

bank card, was sufficient to show that the defendant knew the birth certificate and

social security card belonged to a real person).

Here, the evidence presented at trial was sufficient for the jury to infer that

Iyamu knew that the victims of his identity theft offenses were real people.

Rollins, Amin, and Hall all testified that the credit card applications submitted in

their names listed their correct social security numbers. Furthermore, employees

of Chase Bank and Bank of America testified that a credit card application would

not be approved unless the social security number on the application matched other

identifying information listed on the application, so that an individual's credit

history could be examined. Based on the fact that Iyamu used the victims' correct

social security numbers to obtain credit cards in their names, the jury reasonably

could have inferred that Iyamu was confident that the victims "likely had an actual

credit history" and, therefore, were real persons. *See Holmes*, 494 F.3d at 1258;

14

*Gomez-Castro*, 605 F.3d at 1249. When the Rollins, Amin, and Hall credit card applications were approved, and when the Chopra card was activated, Iyamu should have known that Rollins, Amin, Hall, and Chopra were real people with credit histories. *See Holmes*, 595 F.3d at 1258. Furthermore, when Iyamu began using the Chopra card at Louis Vuitton, he introduced Maxey to an individual who he identified as Chopra. Accordingly, viewing the evidence presented at trial in the light most favorable to the government, *see Tampas*, 493 F.3d at 1297-98, reasonable jurors could have concluded that Iyamu knew that the victims of his identity theft offenses were real people.

### C. *Application of U.S.S.G. § 3B1.1(c) Enhancement*

"A district court's upward adjustment of a defendant's Guidelines offense level due to his status as a leader or organizer under U.S.S.G. § 3B1.1 is a finding of fact reviewed only for clear error." *United States v. Phillips*, 287 F.3d 1053, 1055 (11th Cir. 2002). Under the Guidelines, a two-level role enhancement is applied if the defendant "was an organizer, leader, manager, or supervisor" of an offense involving more than one participant. U.S.S.G. § 3B1.1(c). An offense participant is an individual who is criminally responsible for the commission of the offense even if he is not convicted. *United States v. Holland*, 22 F.3d 1040, 1045 (11th Cir. 1994); U.S.S.G. § 3B1.1, comment. (n.1).

In determining the defendant's role in the offense, the district court should consider:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, comment. (n.4). "[T]he assertion of control or influence over only one individual is enough to support a § 3B1.1(c) enhancement." *United States v. Jiminez*, 224 F.3d 1243, 1251 (11th Cir. 2000).

The district court did not err in applying the three-level § 3B1.1(c) enhancement, because Maxey's testimony established that Iyamu was an organizer, leader, manager, or supervisor of the bank fraud offense. *See* U.S.S.G. § 3B1.1(c). According to Maxey's testimony, at Iyamu's request, Maxey (1) deposited a $10,700 check into his bank account, (2) withdrew the money and returned it to Iyamu, (3) deposited a $74,600 check into his bank account, and (4) gave Iyamu his ATM card and PIN number. Providing the ATM card and PIN number to Iyamu allowed Iyamu to make several additional fraudulent transactions using Maxey's account. This testimony indicates that Iyamu recruited Maxey and exercised decision-making authority, while Maxey simply followed Iyamu's

16

instructions. *See* U.S.S.G. § 3B1.1, comment. (n.4). Iyamu also had a larger role in planning and organizing the offense, as he obtained the fraudulent checks that were deposited into Maxey's account, told Maxey what to do with the checks and the proceeds, and eventually made the deposits himself after obtaining Maxey's ATM and PIN number. *See id.* Finally, Iyamu received a larger share of the offense proceeds, as Maxey testified that Iyamu received $10,000 of the proceeds from the first fraudulent check Maxey deposited, while Maxey received a $700 tip. *See* U.S.S.G. § 3B1.1, comment. (n.4). Thus, based on Maxey's testimony, the district court did not err in applying the enhancement.

Iyamu argues that the district court erred in relying on Maxey's testimony, because his testimony was not credible. However, "[t]he credibility of a witness is in the province of the factfinder and this court will not ordinarily review the factfinder's determination of credibility." *United States v. Copeland*, 20 F.3d 412, 413 (11th Cir. 1994); *see also United States v. Garcia*, 405 F.3d 1260, 1270 (11th Cir. 2005) (holding that "uncorroborated testimony of an accomplice may be enough to support a conviction if the testimony is not on its face incredible or otherwise insubstantial"). There is nothing in the record that would render Maxey's testimony incredible on its face. In fact, although Iyamu argues that Maxey testified falsely about his prior fraud conviction and about his own role in

17

the offense, he cites no evidence in support of these arguments. Accordingly, based on Maxey's trial testimony, the district court did not err in applying the two-level § 3B1.1(c) enhancement.

### D. *Reasonableness of the 70-Month Sentence*

We review the final sentence imposed by the district court for reasonableness. *United States v. Booker*, 543 U.S. 220, 262-64, 125 S.Ct. 738, 766-67, 160 L.Ed.2d 621 (2005). Specifically, the district court must impose a sentence that is both procedurally and substantively reasonable. *Gall v. United States*, 552 U.S. 38, 51, 128 S.Ct. 586, 597, 169 L.Ed.2d 445 (2007). After *Booker*, we established a two-step process for district courts to use in sentencing: first, the district court must consult the Sentencing Guidelines and correctly calculate the sentencing range; second, the district court must consider the factors listed in 18 U.S.C. § 3553(a) in arriving at a reasonable sentence. *United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005).

A sentence may be procedurally unreasonable if the district court improperly calculates the guideline range, treats the Sentencing Guidelines as mandatory rather than advisory, fails to consider the appropriate statutory factors, selects a sentence based on clearly erroneous facts, or fails to adequately explain the chosen sentence. *Gall*, 522 U.S. at 51, 128 S.Ct. at 597.

18

Substantively, "the district [court] should . . . consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall*, 552 U.S. at 49-50, 128 S.Ct. at 596. The factors in § 3553(a) that the court must consider are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims.

*Talley*, 431 F.3d at 786 (citing 18 U.S.C. § 3553(a)). "[W]e may find that a district court has abused its considerable discretion if it has weighed the factors in a manner that demonstrably yields an unreasonable sentence." *United States v. Pugh*, 515 F.3d 1179, 1191 (11th Cir. 2008). Normally, however, the decision of how much weight to accord particular factors in devising a sentence is within the discretion of the district court. *United States v. Clay*, 483 F.3d 739, 743 (11th Cir. 2007).

Here, the district court did not err by failing to consider Iyamu's sentencing arguments, because the district court specifically asked Iyamu what he felt would

19

be a reasonable sentence and allowed him an opportunity to present arguments in support of his recommendation. Iyamu informed the court that he had worked consistently in the United States, had four United States children, no prior arrests, and had offered to cooperate. Since the district court specifically asked for Iyamu's opinion regarding a reasonable sentence, there is no indication that the court did not consider the statements Iyamu offered in response. Iyamu also argues that his sentence was unreasonable because the court erred in finding that he was a manager or supervisor of the offense. However, as discussed above, the district court did not err in making this determination.

Iyamu's sentence is also substantively reasonable. Although his sentence was at the high end of the applicable guideline range, the nature and circumstances of the offense, the need to reflect the seriousness of the offense and promote respect for the law, and the need to protect the public, all support a sentence at the high end of the applicable guideline range. *See Talley*, 431 F.3d at 786; 18 U.S.C. § 3553(a). The offenses for which Iyamu was convicted spanned several months, involved numerous fraudulent purchases at luxury retail stores, and caused seven banks to incur significant losses. In addition to the banks that suffered losses, Iyamu stole the identities of four individuals. Based on the significant amount of loss caused by Iyamu's conduct, the duration of the offense, and the number of

20

victims affected, Iyamu's 70-month sentence was not substantively unreasonable.

Accordingly, we affirm Iyamu's convictions and sentence.

**AFFIRMED.**